[Cite as *State v. Hughes*, 2018-Ohio-1237.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-16-056

      Appellee                                Trial Court No. 2015CR0148

v.

Gilbert John Michael Hughes              **DECISION AND JUDGMENT**

      Appellant                               Decided:  March 30, 2018

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Appellant, Gilbert Hughes, appeals the October 6, 2016 judgment of the

Wood County Court of Common Pleas sentencing him to 8 years in prison.  For the

following reasons, we affirm.

## I. Background and Facts

{¶ 2} On April 16, 2015, Hughes was indicted on one count of endangering children in violation of R.C. 2919.22(B)(1) and (E)(2)(d), a second-degree felony. A jury trial was held beginning on October 3, 2016. The state presented ten witnesses, including the investigating officer; emergency services personnel; several doctors who treated the victim, S.H.; a doctor who specializes in child abuse; and S.H.'s foster father. Hughes presented seven witnesses, including his wife, who is S.H.'s mother; several of his wife's family members; and a pediatric neurology expert. The following facts were developed at trial.

### A. March 6, 2015 Incident

{¶ 3} On March 6, 2015, at 9:01 a.m., the Wood County Sheriff's Office received a 911 call about an unresponsive three-month-old baby in Bowling Green. When paramedics arrived, they found that S.H. was not breathing and had no pulse. S.H. was transported to Wood County Hospital, where she was stabilized. Her treatment included the insertion of an intraosseous line to allow doctors to infuse medication directly into her bone, the insertion of an endotracheal tube to pump oxygen directly into her lungs, the use of a ventilator to breathe for her, and the administration of several doses of epinephrine to help restart her heart. The emergency room doctor who treated S.H. believed that S.H.'s respiratory arrest was caused by respiratory syncytial virus ("RSV") because S.H. had been admitted to the hospital with RSV a couple of weeks earlier.

{¶ 4} S.H. was transferred by air ambulance to the pediatric critical care unit at Toledo Children's Hospital because she was on a ventilator. Dr. Susan Tourner, the

2.

critical care doctor who treated S.H., suspected that S.H.'s cardiac and respiratory arrest were not related to RSV because S.H.'s chest x-ray was clear and it was uncommon for a baby with RSV to improve for a period of time and then deteriorate to the point of respiratory arrest. This led Dr. Tourner to suspect a brain injury, so she ordered a CT scan. The scan showed subdural hematomas (which are areas of blood that collect between the skull and the brain) on both sides of S.H.'s brain. The abnormal CT scan prompted Dr. Tourner to seek an ophthalmological exam and a skeletal survey. The ophthalmological exam showed that S.H. had severe hemorrhaging in all four quadrants of both of her retinas. The skeletal survey showed that S.H. did not have any fractured bones. Based on these results, Dr. Tourner asked Dr. Randall Schlievert, who specializes in child abuse, to consult on the case. Several witnesses testified that S.H. did not have any external signs of trauma or injuries, such as bruises or lacerations. The doctors who treated S.H. in the critical care unit and Dr. Schlievert, the state's expert, testified that S.H.'s injuries were consistent with shaken baby syndrome (also called abusive head trauma)[1] even though S.H. did not have any visible external injuries.

## B. The Experts' Testimony

### 1. Dr. Schlievert's Testimony

_____

[1] During his testimony, Dr. Joseph Scheller, Hughes's expert, clarified the difference between the terms "shaken baby syndrome" and "abusive head trauma." He explained that shaken baby syndrome is a type of abusive head trauma that refers narrowly to a group of three major symptoms: subdural hemorrhage, retinal hemorrhage, and abrupt alteration in consciousness. In 2009, the name was changed to abusive head trauma, a term that encompasses any nonaccidental head trauma, such as the trauma that occurs from a child being hit on the head with a baseball bat or thrown against something.

3.

{¶ 5} Dr. Schlievert, who the court qualified as an expert in child abuse, provided more in-depth testimony about shaken baby syndrome and S.H.'s injuries. Dr. Schlievert defined shaken baby syndrome as a group of physical injuries, including subdural hematoma, retinal hemorrhage, fractures, and brain damage that result from repetitive, violent shaking of a baby. He said that shaken babies had bruising in only about half of cases and fractures in only about 20 to 30 percent of cases. He explained that the typical combination that leads to a caregiver shaking a baby is a baby who is crying and a caregiver who is tired, stressed, or has failed to bond with the baby.

{¶ 6} Regarding S.H.'s injuries, Dr. Schlievert said that Dr. Tourner asked him to examine S.H. because she showed signs of abusive head trauma. He noted that the pattern of retinal hemorrhaging seen in S.H.'s eyes was indicative of abusive head trauma and helped rule out other causes, such as blood clots, infections, and genetic conditions. He also said that her CT scan showed subdural hematomas that were composed of both fresh and old blood. He emphasized that the CT scan could not provide the exact dates the hematomas occurred, but he believed that the appearance of the fluid was indicative of a recent shaking incident and an earlier shaking incident. Dr. Schlievert said that a baby exhibiting symptoms of a brain injury was a better indicator of when a shaking event happens than the appearance of the brain on a CT scan. In S.H.'s case, she exhibited apnea on February 20, which Dr. Schlievert said was mistakenly attributed to RSV when it was actually likely caused by shaking. A shaking incident on February 20 would account for the old blood in S.H.'s CT scan. On March 6, S.H. exhibited

4.

respiratory and cardiac arrest, which Dr. Schlievert attributed to shaking. Shaking on March 6 would account for the fresh blood in her CT scan. Dr. Schlievert also confirmed that S.H. did not have any external signs of injury or any broken bones.

{¶ 7} Dr. Schlievert also ruled out alternate explanations for S.H.'s injuries and CT scan results. He said that S.H.'s MTHFR gene mutation could not account for her medical condition on March 6 because the risk that the mutation would lead to a blood clot is small and, although a localized clot could explain a subdural hematoma, it would not explain the presence of other signs of abusive head trauma. Dr. Schlievert also dismissed the likelihood that the old blood could be related to a birth injury because, even assuming that a birth injury caused some later bleeding, it would not cause brain damage and, thus, would not cause the serious symptoms S.H. had. In his opinion, S.H.'s injuries were caused by someone violently shaking her.

### 2. Dr. Scheller's Testimony

{¶ 8} To counter Dr. Schlievert's testimony, Hughes presented Dr. Joseph Scheller's testimony. Dr. Scheller is a pediatric neurologist with special training in reading CT and MRI scans. In preparing his report, Dr. Scheller reviewed S.H.'s medical records, but did not examine her. His review of the records led him to believe that S.H. suffered from birth trauma that caused her to develop a hygroma, which is a collection of thick fluid between the skull and the brain. The "old blood" Dr. Schlievert identified on the CT scan was really fluid from the hygroma and the "fresh blood" was a natural result of S.H.'s body ridding itself of the hygroma. He said that his conclusion is supported by

the increase in S.H.'s head circumference relative to other children her age, S.H. having the MTHFR gene mutation and elevated platelets, and his reading of S.H.'s CT and MRI scans.

{¶ 9} Initially, Dr. Scheller noted that he found it striking that S.H. did not have any visible injuries that could be attributed to abuse; he said it is possible—but unusual—for an abused child to present without any external injuries.

{¶ 10} Relative to S.H.'s head size, Dr. Scheller testified that the doctor who attended S.H.'s birth mistakenly plotted S.H. on the growth curve for a baby born after 37 weeks' gestation and found that her head circumference was in the 50th percentile. He said that her weight more closely corresponded with a baby born after 40 weeks' gestation and plotting her measurement on the growth curve for full-term babies put her in the 20th percentile for head circumference. By her two-week checkup, S.H.'s head circumference was in the 90th percentile for babies her age. Dr. Scheller thought that this increase was unusual and represented some underlying problem. He also said that her birth record noted some swelling on her scalp, which indicated to Dr. Scheller that S.H.'s passage through the birth canal had been "a little bit more squeezed" than average.

{¶ 11} As to the MTHFR gene mutation, Dr. Scheller testified that it is sometimes associated with excessive blood clotting. S.H. also had elevated blood platelet levels both times she was admitted to the hospital, which also could have caused excessive clotting.

6.

{¶ 12} When Dr. Scheller reviewed S.H.'s CT scan, he noted that S.H. did not have a skull fracture or any scalp swelling. He also identified a symmetrical collection of fluid between S.H.'s skull and brain that wrapped around the front of her skull, roughly from ear to ear. Dr. Scheller said that this fluid collection explained why S.H.'s head circumference increased so dramatically between birth and her two-week checkup.

{¶ 13} Dr. Scheller also identified fresh blood near the front right, back center, and top center of S.H.'s skull. He said that the fresh hematomas were small and not pushing on the brain, so they should not have caused any dramatic problems.

{¶ 14} He claimed that it is not uncommon for children who have large heads to have fluid accumulations like the one he saw in S.H., but said that the accumulations are generally benign. Most children's bodies are able to break down the fluid and remove it from the body. As part of the removal process, the body creates new blood flow to the affected area by growing blood vessels and the new vessels sometimes bleed. This results in blood that is not touching the surface of the brain and does not cause the same effects as blood from trauma, which does touch the surface of brain.

{¶ 15} On the whole, Dr. Scheller believed that S.H.'s brain looked fairly good, despite the hematomas, so the CT scan did not explain why S.H. had a near-death experience on March 6.

{¶ 16} Dr. Scheller went on to review S.H.'s brain MRI from March 7, 2015. He explained that an MRI gives more detailed images of the brain's anatomy. The fluid around S.H.'s brain was a grayish color on the MRI images, which Dr. Scheller said was indicative of a hygroma, as opposed to normal spinal fluid, which appears black on MRI

7.

images.  Although old blood and hygroma fluid are the same color on an MRI, making it impossible to differentiate between the two, the fact that the collection of fluid was symmetrical led him to believe that the fluid was not trauma-related.  He said that shaking a baby would cause hematomas at the front and back of the head because the head is moving back and forth very quickly, but would not cause bleeding at the top of the head, like S.H. had.  At every hospital he has worked for, he has encountered practitioners who were specifically looking for abusive head trauma who also confused hygromas and old blood on brain scans.

{¶ 17} The MRI also showed that the fresh blood seen on the CT scan was not only above the surface of the brain, but was also touching the surface of the brain. According to Dr. Scheller, blood on the surface of the brain can cause seizures, which manifest in babies as changes in color, circulation, breathing, and blood pressure.  Dr. Scheller also showed the jury MRI images of the blood flow in S.H's brain.  The images showed symmetrical areas on both sides of her brain that were damaged.  Dr. Scheller attributed this pattern to a lack of blood and oxygen flow.  In short, he did not believe that S.H.'s brain images showed a picture of someone who had suffered head trauma.

{¶ 18} Dr. Scheller referred to S.H.'s CT scan from September 2015 to support his conclusion.  The images showed that S.H. had an even thicker layer of fluid around her brain and had fresh blood—that is, a new subdural hematoma—near the front left of her skull.

{¶ 19} Regarding S.H.'s retinal hemorrhages, Dr. Scheller testified that any change in the pressure of the brain affects the delicate veins in the eye by putting pressure

8.

on them and causing them to leak. He believed that S.H.'s retinal hemorrhages were likely caused by the change in her brain pressure that resulted from the clots on the surface of her brain, not abusive head trauma.

{¶ 20} Taking all of this information into consideration, Dr. Scheller concluded that S.H. suffered from a severe seizure on March 6 due to blood clots on the surface of her brain. The clots resulted from bleeding that occurred as her body tried to absorb the fluid from the hygroma, which, in turn, was caused by birth trauma. And the seizure—not abusive head trauma—caused S.H.'s respiratory arrest and resulting brain damage on March 6. Dr. Scheller said that it was possible (although unlikely) that S.H. was shaken, but that her brain did not look like a brain that had suffered a traumatic injury. Rather, it looked like a brain that was going through a chronic process and suffered an acute complication.

{¶ 21} During cross-examination, Dr. Scheller confirmed that he is not board-certified in child abuse and does not consider himself an expert in child abuse. He defended his decision to use 40 weeks as S.H.'s gestational, instead of 37 weeks as the attending pediatrician did, by explaining that S.H.'s measurements were inconsistent with a 37-week baby's measurements and noting that many parents have an inaccurate perception of their baby's gestational age. He claimed that common sense told him that a doctor would expect to see external injuries on a baby with abusive head trauma, but he could not point to any specific research that reached the same conclusion. He also admitted that it is possible for a baby to have a head injury without also having evidence

9.

of external injuries. He agreed with the prosecutor that the standard belief among child abuse experts is that a baby with abusive head trauma usually does not have bruising on her body, but he disagreed with that conclusion.

### 3. Dr. Schlievert's Rebuttal Testimony

{¶ 22} For its rebuttal case, the state recalled Dr. Schlievert. He explained that the body naturally releases more platelets in response to trauma. Even though S.H.'s platelet counts were elevated, they were not elevated enough to cause clotting. In fact, Dr. Schlievert believed that the elevated platelet counts were a response to the brain trauma S.H. suffered, not the cause of it. As far as S.H.'s retinal hemorrhages, Dr. Schlievert said that there were too many and they were too widespread to be caused by a change in brain pressure. He believed that all of S.H.'s injuries occurred from being violently shaken. Dr. Schlievert disagreed with Dr. Scheller's conclusion that S.H. had blood clots sitting on the surface of her brain. Even if she did, he said, such clots would not cause seizures. Seizures do not cause brain damage unless they last for almost an hour; the instant change seen in S.H. shows that her brain damage was the result of physical trauma, not the result of a seizure.

### C. The Effects on S.H.

{¶ 23} Prior to March 6, 2015, S.H. appeared to be developing normally. The pediatricians who examined her at birth and at wellness checkups said that she was generally healthy prior to her RSV diagnosis on February 20. Her head circumference at birth was in the 50th percentile on growth charts and in the 90th percentile at all of her

10.

wellness checks.  Neither doctor had concerns about S.H.'s growth.  Both pediatricians also testified that children's heads grow significantly during the first two years of life and the increase in S.H.'s head size did not concern them.

{¶ 24} S.H.'s foster father testified about S.H.'s life following March 6, 2015.  At the time of trial, S.H. was nearly two years old.  But she had the mentality of a baby who is no more than four months old.  She regularly receives physical, occupational, and speech therapy to help her learn to perform activities such as swallowing, sucking, grabbing objects, and controlling her head.  She is nonmobile and has a tracheostomy tube that requires frequent suctioning.  She cannot ingest food through her mouth because her stomach does not function properly, so she is fed through a tube that goes directly into her intestines.

{¶ 25} S.H. receives medicines five times a day.  She takes seven different medicines to control seizures, reduce stomach acid, improve breathing, and relieve pain.  Additionally, S.H. must spend several hours a day wearing a back brace to correct her spine curvature and using a pulsating vest to help clear the mucus in her lungs.  The foster father testified that his wife, a registered nurse, quit her job to attend to S.H.'s care and her numerous medical appointments each month.

### D.  The Police Investigation

{¶ 26} Sergeant Scott Kleiber of the Bowling Green Police Division was one of the officers who investigated this case.  He testified that he was dispatched to Wood

11.

County Hospital on March 6, 2015, to investigate a 911 call about an unresponsive child. When he arrived at the hospital, he was told that doctors were working to restore S.H.'s breathing.

{¶ 27} When Kleiber and his partner spoke to Hughes about the incident, Hughes told them about S.H.'s February 20 RSV diagnosis and said that he believed the same thing was happening again. Hughes said that S.H. was very fussy and crying a lot that morning, and he had trouble calming her down. When Kleiber asked Hughes if S.H. made him mad that morning, Hughes responded, "Well, a little bit, but she's tiny and I am not trying to hurt her." When Hughes could not calm S.H. down and he started to get upset, he put her in her swing and walked to the back of their home (approximately 25 to 30 feet from the swing). He said that he was gone for a short time, during which he texted his wife and S.H.'s mother, Janel, and when he returned, S.H. was lifeless and had her tongue sticking out. Hughes told Kleiber that he had bounced S.H. and patted her on the back and conceded that he may have done it too roughly. Hughes also indicated that bonding with S.H. had been difficult.

{¶ 28} While talking to the officers, Hughes allowed Kleiber's partner to read text messages on his phone. Kleiber testified that Hughes sent Janel a picture of S.H. at 8:52 a.m. with the caption "Cranky fucking pain in the ass." Although Kleiber subpoenaed Hughes's phone records, the records do not contain this message. The first March 6 message in the phone records was from Hughes to Janel at 8:53 a.m. It said, "Wont [sic] shut up."

12.

{¶ 29} Kleiber also read several texts message Hughes sent to Janel on March 1, including ones that said:

> Is it bad if I cant wait til I got ro work on monday [sic].

> At work I don't have a screaming baby.  Just bitchy coworkers and some students[.]

> I can't take this random ass crying and screaming.

> She makes me fucking tense  This is serious FUCKING BULLSHITT that acts this way with me I love both of y all to death but I m so FUCKING stressed out [sic].

{¶ 30} On March 7, the day after S.H. was admitted to the hospital, Hughes sent the following messages to Janel:

> I was the last one taken [sic] care of her.  It always happens when she is with me.

> I may not be crying on the outside but I'm totally torn up on the inside[.]

> I still feel like I did something WRONG to her.

### E.  Hughes's Witnesses

{¶ 31} During his case, Hughes first presented the testimony of Janel's mother, grandmother, and two of her aunts.  All four women testified that they had seen Hughes interact with and care for S.H. and did not have any concerns with the way Hughes treated her.  They described him as doting, protective, caring, gentle, and concerned about making sure that he was doing things correctly.  None of them ever saw Hughes

13.

angry or frustrated with S.H., although one of the aunts testified that S.H. did not sleep enough for Hughes and S.H. preferred Janel. Janel's mother also said that she was not concerned by the tone of Hughes's text messages to Janel and it was not unusual for Hughes to use swear words. None of the women believed that Hughes abused S.H.

{¶ 32} Janel also testified on Hughes's behalf. She and Hughes were married on May 13, 2013. S.H., who was born on November 19, 2014, is their only child. Janel had high blood pressure and gestational diabetes while she pregnant, so she was induced 17 days before her due date. She also mentioned that S.H. "got stuck" during the birth, and said that someone told her that S.H.'s shoulder had been partially dislocated, but that they had "popped it back in."

{¶ 33} Janel returned to work in mid-January 2015. She worked from 2:00 a.m. to 10:30 a.m. at a restaurant near their home. Hughes cared for S.H. from the time Janel went to work until Janel's aunts arrived at 8:30 a.m. to watch S.H. while Hughes worked.

{¶ 34} On February 20, Janel was at work when Hughes called and told her that something was wrong with S.H., who was not breathing normally. Janel rushed home, and they took S.H. to Wood County Hospital. S.H. was transferred to Toledo Children's Hospital where she stayed overnight. She was diagnosed with RSV. Several days later, S.H. still was not breathing correctly. In addition to continuing breathing problems, Janel said that S.H. startled more easily after the February 20 incident and, beginning about a week after, vomited daily for approximately a week. The vomiting stopped on March 1 and S.H. was healthy until March 6. S.H. was still jumpy during those days, but otherwise seemed to be acting like herself again.

14.

**{¶ 35}** Janel said that March 6 started normally, with Hughes sending her the usual updates about S.H. Shortly before 9:00 a.m., Janel received a text message from Hughes saying that something was not right with S.H. Hughes called soon after and said, "She's doing it again." Janel immediately left work and went home to check on S.H. She found S.H. lying on the floor and Hughes attempting rescue breathing. Janel took over the rescue breathing and told Hughes to call 911. Hughes went outside to wait for the ambulance because their home is difficult to locate. Janel rode in the ambulance with S.H. Hughes drove to the hospital separately, and Janel estimated that he arrived about 30 minutes later. Once S.H. was stable, she was transferred by air ambulance to Toledo Children's Hospital.

**{¶ 36}** Hughes's counsel asked Janel about the text messages. She said that she, by her own choice, had been S.H.'s main caretaker while she was on maternity leave, so Hughes did not have a chance to develop his parenting skills and his ability to comfort S.H. until Janel went back to work. She said that Hughes is a "tense" person, but she viewed the text messages as nothing more than him expressing his frustration with not being able to comfort S.H. She believed that Hughes was stressed, but not inordinately so.

**{¶ 37}** Like her relatives, Janel described Hughes as loving, caring, and protective. She did not believe that Hughes hurt S.H. Janel explained that she and Hughes wanted children and Hughes was excited about S.H.'s birth. While Janel had seen Hughes get frustrated with S.H. and walk away from her, she had never seen him get angry with S.H.

15.

Janel also said that Hughes had some difficulty bonding with S.H., so she encouraged him to join a Facebook group for new dads. She was in a similar group for new moms.

{¶ 38} Finally, Hughes testified on his own behalf. Regarding the February 20 incident, he said that S.H. was fine for a while that morning, but then she began gasping for air and breathing irregularly. He began doing rescue breathing and sent a message to Janel, who came home. Janel continued rescue breathing while Hughes dressed, and then he drove them to the hospital. When S.H. came home from the hospital, Hughes said that she was extremely cranky and fussy. He echoed Janel's testimony that S.H. startled more easily than normal and vomited for several days, but seemed to be better by March 1.

{¶ 39} March 6 began as a normal day. Around 7:30 or 8:00 that morning, S.H. woke up screaming and Hughes could not quiet her. He said that he tried feeding her, bouncing her, and changing her diaper, but she did not stop crying. He was getting frustrated, so he put her in her bouncy seat and walked to his bedroom to get dressed. He had been back there for a time when he noticed that S.H. had gotten quiet. He went to check on her and found her slumped over in her bouncy seat with her tongue sticking out. He took her out of her seat and nudged her to see if it would wake her up. When she did not, he messaged Janel, saying "she's doing it again." When Janel got home, Hughes called 911. He explained that their house is off an alley, not the street in their address, so he went outside to wait for the ambulance to make sure the paramedics could find the house. The paramedics came in and took S.H. to the hospital. Hughes spent some time gathering things like clothes and the diaper bag and then left for the hospital.

16.

{¶ 40} During cross-examination, Hughes disagreed with the pediatricians' characterization of S.H. as a completely healthy baby; his intuition told him that something was wrong with S.H. even though her wellness checkups were normal. Hughes admitted that he did not feel like S.H. was bonding with him. As a result, he joined the Facebook group for new dads. He testified on direct about a time when S.H.'s head fell forward while he was holding her and hit him in the face. On cross, Hughes said that he believed S.H. did this intentionally. When Hughes could not get S.H. to stop crying even though he had tried "everything," he walked away because he "didn't want anything to happen."

{¶ 41} Regarding the text messages, Hughes testified that he sent the messages on March 1 because S.H. kept crying "for no reason." He said that he researched crying after that to try to figure out how to soothe S.H.

### F. Outcome

{¶ 42} After hearing the evidence, the jury found Hughes guilty of the single count in the indictment. The trial court proceeded directly to sentencing. It sentenced Hughes to eight years in prison and ordered him to pay "the costs of this matter."

{¶ 43} Hughes now appeals the trial court's decision, raising four assignments of error:

I. The trial court erred in allowing the victim to be present in the courtroom, thereby prejudicing Appellant's constitutional right to a fair trial.

17.

II. The trial court erred in denying Appellant's Crim.R.29 [sic] motion.

III. The jury's verdict was against the manifest weight of the evidence presented at trial.

IV. The trial court committed error to the prejudice of Appellant by imposing the costs of prosecution without consideration of Appellant's present or future ability to pay.

## II. Law and Analysis

### A. S.H.'s Presence in the Courtroom was not Prejudicial

{¶ 44} In his first assignment of error, Hughes argues that S.H.'s presence in the courtroom during her foster father's testimony was prejudicial and the trial court erred by permitting it. The state responds that S.H. had the right to be in the courtroom, and the trial court did not err by allowing her to be present.

{¶ 45} At the time of Hughes's trial, crime victims had a constitutional right to "reasonable and appropriate * * * access * * * and to a meaningful role in the criminal justice process." Ohio Constitution, Article I, Section 10a.[2] The legislature provides reasonable access through R.C. 2930.09, which permits a victim to be present whenever the defendant is present during any stage of the case that is conducted on the record, other than a grand jury proceeding, unless the trial court determines that exclusion of the victim

---

[2] Article I, Section 10a was amended by ballot issue 1 on November 7, 2017. The amendment went into effect on February 5, 2018.

18.

is necessary to protect the defendant's right to a fair trial. This is true even when the trial court orders a separation of witnesses. Evid.R. 615(B)(4).

{¶ 46} "Although R.C. 2930.09 provides that a defendant's fair-trial rights are superior to a victim's right to be present, the statute clearly gives the trial court discretion to make the determination whether the victim's presence will prejudice the defendant." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 96. Thus, we review the trial court's decision to permit a victim to be present at trial for an abuse of discretion. Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996). The defendant bears the burden of showing that his right to a fair trial was violated by the victim's presence. *State v. Pickett*, 4th Dist. Athens No. 15CA13, 2016-Ohio-4593, ¶ 18, citing *State v. Ricco*, 11th Dist. Lake No. 2008-L-169, 2009-Ohio-5894, ¶ 27.

{¶ 47} Here, Hughes contends that S.H.'s presence in the courtroom was prejudicial because of S.H.'s "distressed physical condition" and Dr. Schlievert's statement (made before the jury ever saw S.H.) that S.H. "was never coming back." The state responds that Hughes's right to a fair trial was not prejudiced because S.H.'s time in the courtroom was brief and the jury had already seen her physical condition—including the placement of her tracheostomy tube—in pictures that the state admitted into evidence.

{¶ 48} We agree with the state that S.H.'s physical condition is an insufficient reason to exclude her from the courtroom. Hughes does not provide any case law to support this argument, nor were we able to find any.

19.

{¶ 49} Similarly, we find that Dr. Schlievert's statement about S.H.'s long-term prospects of recovery did not prejudice Hughes's right to a fair trial. The testimony by Dr. Schlievert (even ignoring the comment Hughes objects to), the foster father, and Dr. Scheller showed that S.H. had suffered extensive, debilitating brain damage and did not have the abilities of a typical two-year-old.

{¶ 50} Even considering Dr. Schlievert's statement together with the jury's opportunity to see S.H. during her foster father's testimony does not lead us to the conclusion that Hughes did not receive a fair trial. Hughes does not point to anything in the record that shows that these factors affected the jury or tainted their verdict.

{¶ 51} Because there is no evidence that Hughes's right to a fair trial was prejudiced, we find that the trial court did not abuse its discretion in permitting S.H. to be in the courtroom. Accordingly, Hughes's first assignment of error is not well-taken.

### B. The Jury Properly Convicted Hughes of Endangering Children

{¶ 52} In his second and third assignments of error, Hughes argues that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal and that his conviction was against the manifest weight of the evidence. The state contends that the jury properly convicted Hughes. We consider each argument in turn.

### 1. The Trial Court Properly Denied Hughes's Crim.R. 29 Motion

{¶ 53} A motion for acquittal under Crim.R. 29(A) is a challenge to the sufficiency of the evidence. *State v. Messer*, 6th Dist. Lucas No. L-16-1109, 2017-Ohio-1223, ¶ 16. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the

20.

same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 54} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 55} "An entry of acquittal is improper 'if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.'" *State v. Race*, 6th Dist. Sandusky No. S-16-018, 2017-Ohio-612, ¶ 13, quoting *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus.

{¶ 56} To prove that Hughes committed second-degree endangering children, the state was required to prove that Hughes abused a child under 18 years of age and that the abuse caused serious physical harm to the child. R.C. 2919.22(B)(1) and (E)(2)(d).

{¶ 57} Hughes does not contest that S.H., a child under 18 years of age, suffered serious physical harm. Rather, he argues that the state failed to prove that he abused S.H. In response, the state points to evidence showing that (1) S.H. was healthy and

21.

developing normally before February 20, 2015; (2) Hughes was alone with S.H. both times she experienced breathing issues; (3) S.H. never experienced breathing issues or changes in consciousness when she was with another caregiver; (4) Hughes sent angry-sounding text messages to Janel complaining about S.H. on March 1 and March 6; (5) S.H. showed all three symptoms of abusive head trauma on March 6; and (6) doctors ruled out other possible causes for S.H.'s symptoms.

{¶ 58} This evidence is what the court had to consider when it ruled on Hughes's motion for a judgment of acquittal at the close of the state's case. Viewing the facts in the light most favorable to the prosecution, we find that there is sufficient evidence to support a finding that Hughes abused S.H. Accordingly, Hughes was not entitled to a judgment of acquittal at the close of the state's case, and the trial court did not err by denying Hughes's motion.

{¶ 59} When the trial court considered Hughes's Crim.R. 29 motion at the close of all the evidence, the court had before it evidence before it that (1) Hughes was a caring, loving, protective father; (2) no one close to Hughes and S.H. believed that he was capable of hurting her; (3) there is a plausible alternative medical explanation for S.H.'s injuries; and (4) Dr. Schlievert believed that Dr. Scheller's explanation for S.H.'s injuries was wrong. The addition of this evidence to the case could allow reasonable minds to reach different conclusions about whether the state proved its case beyond a reasonable doubt. So, rather than mandating that the trial court grant Hughes a judgment of acquittal, the evidence Hughes presented required the trial court to send the case to the

22.

jury. *Race*, 6th Dist. Sandusky No. S-16-018, 2017-Ohio-612, at ¶ 13. Thus, we find that the trial court properly denied Hughes's Crim.R. 29 motion. Hughes's second assignment of error is, therefore, not well-taken.

### 2. Hughes's Conviction is not Against the Manifest Weight of the Evidence

{¶ 60} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983). Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

23.

**{¶ 61}** After reviewing the evidence and the credibility of the witnesses, we are not convinced that the evidence weighs heavily against Hughes's conviction. Nor can we say that the jury lost its way or created a manifest miscarriage of justice by convicting Hughes of endangering children. We find, therefore, that Hughes's conviction is not against the manifest weight of the evidence. Accordingly, Hughes's third assignment of error is not well-taken.

### C. The Trial Court Properly Imposed Costs

**{¶ 62}** Hughes's fourth assignment of error challenges the trial court's imposition of the costs of prosecution. He contends that the trial court did not make a finding that he has or will have the ability to pay before it ordered him to pay costs. The state argues that the trial court properly imposed the costs of prosecution because such costs do not require a finding that the defendant has the ability to pay and did not impose any other costs, so Hughes's arguments regarding the other costs are moot. We agree with the state.

**{¶ 63}** Our standard of review on this issue is whether the imposition of costs and financial sanctions was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b); *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060 and L-15-1061, 2016-Ohio-1571, ¶ 4, citing *State v. Collins*, 12th Dist. Warren No. CA2014-11-135, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 30 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law."). With regard to the costs of prosecution, R.C. 2947.23(A)(1)(a) provides that the trial court shall render a judgment for the costs of prosecution without consideration of

whether the defendant has the ability to pay such costs. *State v. Rohda*, 6th Dist. Fulton No. F-06-007, 2006-Ohio-6291, ¶ 13.

{¶ 64} Here, the only costs imposed by the trial court were the costs of prosecution. At sentencing, the court said only that "I'm going to order you to pay the costs of this matter * * *" and stated in its judgment entry of conviction and sentence that Hughes is "ordered to pay the costs of this prosecution." Under R.C. 2947.23(A)(1)(a), the trial court is not required to determine whether the defendant has or will have the ability to pay before imposing the costs of prosecution. Consequently, we find that the trial court's imposition of costs was not contrary to law. Hughes's fourth assignment of error is not well-taken.

### III. Conclusion

{¶ 65} Based on the foregoing, the October 6, 2016 judgment of the Wood County Court of Common Pleas is affirmed. Hughes is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

_____
Thomas J. Osowik, J.                                                         JUDGE

James D. Jensen, J.

_____
CONCUR.                                                                          JUDGE

_____
                                                                                         JUDGE