[Cite as *State v. Baldwin*, 2020-Ohio-699.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

Court of Appeals No.  WD-18-064

    Appellee

Trial Court No. 2017CR0507

v.

Kevin Ray Baldwin

**DECISION AND JUDGMENT**

    Appellant

Decided:   February 28, 2020

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney,
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Following a jury trial, defendant-appellant, Kevin Ray Baldwin, appeals the July 25, 2018 judgment of the Wood County Court of Common Pleas, convicting him of engaging in a pattern of corrupt activity and receiving stolen property.  For the reasons that follow, we affirm Baldwin's convictions.

## I. Background

{¶ 2} According to the evidence presented by the state at trial, Kevin Baldwin and co-defendant, William Gentry, perpetrated a scheme to sell stolen trailers. Baldwin would acquire a stolen trailer. He would then contact Gentry to let him know that he had a trailer available and how much he expected to be paid for the trailer. Gentry would pick the trailer up from Baldwin, facilitate the sale of the trailer at a price that would allow him to make a profit, then pay Baldwin their previously agreed-upon price. In all, 45 trailers were stolen from their rightful owners and sold to third parties.

{¶ 3} Baldwin was charged in a four-count indictment with engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1) and (B)(1), a first-degree felony (Count 1); two counts of receiving stolen property, violations of R.C. 2913.51(A) and (C), fifth-degree felonies (Counts 2 and 3); and receiving stolen property, a violation of R.C. 2913.51(A) and (C), a fourth-degree felony (Count 4).

{¶ 4} Count 1 was premised on four incidents: (1) the July 8, 2016 theft of a Haulin trailer, vehicle identification number ("VIN") 5NHUHAV22DW065443 ("the Haulin trailer"), with a 1973 Honda CB450 motorcycle stored inside, stolen from Walbridge, Wood County, Ohio; (2) the July 11, 2016 theft of a homemade 16-foot-by-two-foot axel trailer ("the homemade trailer"), stolen from Walbridge, Wood County, Ohio; (3) the August 19, 2016 theft of a 28-foot trailer, VIN 1L9723T55G1317973 ("the 28-foot trailer"), with a snowmobile stored inside, stolen from Perrysburg, Wood County, Ohio; and (4) the theft of 42 additional trailers stolen in Northwest Ohio and Southeast Michigan over the period of November 23, 2013, to June, 2017.

2.

{¶ 5} Count 2 was premised on the July 8, 2016 theft of the Haulin trailer from its owner, J.Mo. Count 3 was premised on the July 11, 2016 theft of the homemade trailer from its owner, T.Z. And Count 4 was premised on the August 19, 2016 theft of the 28-foot trailer from its owner, R.S.

{¶ 6} The case was tried to a jury on July 18-20, 2018. The state presented testimony from C.J., J.M., J.Mo., S.B., T.H., and R.S., six men whose trailers were stolen; Sean Rizor, an investigator with the Ohio Bureau of Motor Vehicles ("BMV") assigned to the Ohio State Highway Patrol's vehicle theft unit; Michael Griffin, who admitted to stealing four trailers that he sold to Baldwin; and Gentry.

## 1. C.J.

{¶ 7} C.J. testified that he owns his own electrical contracting company. He purchased a 24-foot trailer in 2015 or 2016, for approximately $11,000-$13,000, which he used both personally and professionally. His trailer was registered and titled with the BMV. It had a custom epoxy floor. C.J. stored the trailer—which was locked—at his shop in Toledo in a fenced-in yard secured with a lock. It was stolen in July of 2016. There were items in the trailer, including a winch, battery, jack, and straps. The trailer was eventually recovered by the Woodville Police Department. The items in the trailer were never returned. C.J. does not know who stole the trailer.

## 2. J.M.

{¶ 8} J.M. is employed by a company that performs asbestos removal, lead abatement, sandblasting, and other such services. The company owned a very distinctive trailer that provided employees with a space to remove contaminated clothing and to

3.

shower after work. It had air and water filtration systems stored under the floor, so the trailer stood a little taller than most. The filtered water was released from the trailer through a drain line that connects to the sewer and visibly protrudes from the side of the trailer.

{¶ 9} J.M. testified that around 7:00 a.m. on December 29, 2016, he arrived at work to find that the trailer was missing. He filed a report with the Toledo Police Department and contacted the president of the company. Given the value of the equipment housed in the trailer, the president suggested that J.M. scour the area to try to find it. J.M. devoted most of December 29, 2016, to driving around the city of Toledo searching for the trailer. On December 30, 2016, J.M. was driving home down State Route 20 through Woodville, Ohio, when he looked to his left and saw the company's trailer sitting next to a barn just outside of town on the property of William Gentry, who J.M. had known for many years. J.M. was sure it was his company's trailer because he could see the drain sticking out of the side. He went to the Woodville Police Department and reported that he found the trailer. J.M. conceded that he does not know how Gentry got the trailer.

### 3. J.Mo.

{¶ 10} J.Mo. testified that he owned an eight-and-a-half-by-20-foot trailer that he used for hauling motorcycles. He paid $4,000 for it. He painted the inside of it orange and black. He stored it in Moline in Wood County, Ohio, with locks on every door. On July 8, 2016, he noticed that it had been stolen. He reported it to the Lake Township Police Department. There was a 1973 Honda motorcycle in it when it was stolen. J.Mo.

4.

had also been using the trailer to store memorabilia that he received from his father, who had recently passed away. There were photos, scrapbooks, death certificates, and mementos from his uncle who had been killed in Vietnam. The trailer was recovered by the State Highway Patrol in May of 2017, but the contents were never located.

### 4. S.B.

{¶ 11} S.B. purchased a seven-by-14-foot Stealth trailer on August 17, 2015, for $3,920.94. He was using it to move from Michigan to Lima, Ohio. He had items stored in it, including antique guns and personal household goods that belonged to his son who had been deployed. The contents had a value of approximately $23,000. S.B. was storing the trailer, locked, at his church in Lambertville, Michigan. The trailer went missing in June of 2016. It was recovered in May of 2017. The only item returned to him from the trailer was one of the firearms, which the Toledo Police Department had seized during a raid of a home.

### 5. T.H.

{¶ 12} T.H. purchased a 16-foot Stealth trailer on April 28, 2016, that he used for his lawn care business. It was stolen from his home in Maumee, Ohio, with his lawn equipment inside. Between the trailer and the contents, the value was approximately $30,000. The trailer was eventually recovered in Findlay, Ohio, but the contents were gone. T.H. did not know who took it.

### 6. R.S.

{¶ 13} R.S. owned a 24-foot Thunder Snow trailer that he parked at his home in Lake Township, Wood County, Ohio. He stored his snowmobile in it. It was stolen in

5.

December of 2016. A year or so later, the trailer was recovered, but the snowmobile was not.

### 7. Sean Rizor

{¶ 14} Rizor became involved in this case on February 20, 2017. At that point, it had been discovered that Gentry had sold three stolen trailers, including J.M's customized decontamination trailer. Rizor knew Gentry. He was the owner of Gentry Auction. Gentry is a licensed auctioneer, but he also locates and transports cars for motor vehicle dealers. Although not a licensed dealer himself, Gentry sold vehicles and trailers out of the front yard of his home. He had been warned in the past that given the volume of vehicles he was selling, he could be prosecuted for doing so without a license.

{¶ 15} Soon after becoming involved in the investigation, Rizor witnessed Gentry hauling a trailer with a license plate designating that it was a homemade trailer when it was clear that the trailer he was hauling had been manufactured by PJ Trailer. Gentry was stopped, and Rizor discovered that the VIN that was legally required to be on the trailer had been removed. Using a concealed VIN ("con-VIN") from the trailer, Rizor was able to determine that the trailer was stolen. Gentry was asked how long he had had the trailer and he said two years. Records showed that the trailer had actually been stolen seven months earlier.

{¶ 16} Rizor decided to get a search warrant for Gentry's records, including his receipt books, but ultimately Gentry's wife relinquished the receipt books voluntarily.

6.

There were two kinds of receipts in the books obtained from Gentry: (1) receipts reflecting his purchase of each trailer from Baldwin, and (2) receipts reflecting his sale of each trailer to a third party.

{¶ 17} The receipts reflecting Gentry's purchase of each trailer from Baldwin identified the date the trailer was purchased, a description of the trailer (but no VIN), the purchase price, the method of payment (always cash), and sometimes a signature or initials signifying Baldwin's receipt of the cash. The receipts reflecting Gentry's sale of trailers to third parties identified the purchaser's name and sometimes their address, a description of the trailer (but never the VIN), the price for which it was sold, the method of payment (cash or check), and the seller's name (either Gentry or his wife).

{¶ 18} Rizor traced each of the trailers sold by Gentry and determined that 45 had been stolen. In many cases, VINs had been removed, so trailers had to be identified using con-VINs or from other information. Rizor compiled a spreadsheet identifying information about each trailer, including the purchaser, the person from whom the trailer was stolen, the make, model, year, and VIN of the trailer, whether, when, and from where the trailer was recovered, and the agency to which the theft was reported. Examining phone records, Rizor also observed that on or about the dates of the thefts, there was frequent communication between Baldwin, the Gentrys, and Michael Griffin, a man who had been prosecuted in Sylvania Municipal Court for stealing trailers. The frequency of these contacts is also noted in his spreadsheet. Rizor methodically explained each entry in the spreadsheet at trial.

7.

{¶ 19} Rizor testified about his communication with Griffin. The Lucas County Sheriff's office put him in contact with Griffin after he had been prosecuted in Sylvania Municipal Court. Griffin admitted to Rizor that he stole trailers with and on behalf of Baldwin. At Rizor's request, Griffin placed a call to Baldwin—with Rizor listening and recording— and told Baldwin that he needed extra money and had a couple of trailers available. Baldwin said that he could not do anymore trailers because his "source got locked with like three of them" and he had no outlet for them anymore. A recording of this call was played for the jury.

### 8. Michael Griffin

{¶ 20} Michael Griffin has a criminal record. He has served prison time for receiving stolen property and for drug-related offenses. Griffin testified that on approximately four occasions, he stole trailers, sold them to Baldwin, and delivered them to Baldwin's residence. Consistent with Rizor's testimony, Griffin explained that in cooperation with Rizor, he called Baldwin from his cell phone. Griffin told Baldwin that he needed extra money and had a couple of trailers available. Baldwin said that he could not do anymore trailers because his "source got locked with like three of them" and he had no outlet for them anymore. Griffin asked if there was anything else he had an outlet for, and Baldwin responded that he could use some four-wheelers and dirt bikes.

{¶ 21} Griffin testified that he received text messages from Baldwin's brother the night before his trial testimony, calling him an "undercover police snitching bitch." Although no physical threat was made, Griffin found Baldwin's brother's text messages to be threatening.

8.

## 9. William Gentry

{¶ 22} Gentry testified that like Baldwin, he was charged in this case with engaging in a pattern of corrupt activity and receiving stolen property. His wife was also charged. He entered into a plea agreement with the state pursuant to which he would enter a plea of guilty to engaging in a pattern of corrupt activity and the state would dismiss the charges against his wife. He entered the plea in large part to protect his wife. Gentry had not yet been sentenced, but was facing two to eight years in prison. He explained that he offered to testify in the case, not as part of that plea agreement, but rather "to get it off of [his] chest of what happened so that other people would know what happened to [him]." Gentry acknowledged that he had victimized a lot of people.

{¶ 23} Gentry testified that he has been acquainted with Baldwin for 20 years. Baldwin worked at K & K, a dealership owned by a relative of Baldwin. They had done hundreds of transactions together. In May or June of 2016, Baldwin asked him if he was interested in selling trailers. Gentry said that he was as long as he could make a profit. Baldwin would take pictures of trailers and send them to Gentry's wife (who had a smartphone), along with the price he was charging. Gentry would pick the trailer up from the lot next to Baldwin's home. Gentry marked up the price on each trailer based on what he believed to be a reasonable profit.

{¶ 24} Gentry did not have the cash to pay Baldwin up front, so Gentry would sell the trailer, then pay Baldwin the agreed-upon price after completing the sale. Baldwin required to be paid in cash. If Gentry accepted a check from a customer, he would wait until it cleared, then pay Baldwin. Baldwin would come to Gentry's home to get the

9.

cash.  If the Gentrys were home, they would have Baldwin sign a receipt; sometimes Baldwin would sign only his initials.  If they were not home, they would leave the cash in a cushion of a chair on their porch and Baldwin would pick it up.  Gentry identified Baldwin's signature.

{¶ 25} When he first agreed to sell trailers from Baldwin, Gentry told Baldwin that he would need receipts.  Baldwin agreed, but never provided the receipts, so Gentry made his own.  He acknowledged that he did not mark down VINs on the receipts.  He claimed that VINs were "inconsequential" to him because almost all of the trailers weighed less than 4,000 pounds.  (Rizor had previously explained that trailers that weigh less than 4,000 do not need to be titled.)  Gentry insisted that 90 percent of the trailers had the VIN intact, but acknowledged that some did not.

{¶ 26} Gentry did not know where Baldwin got the trailers or whether they were stolen.  Baldwin told him at one time that he had an "in" with a guy who dealt in repossessed and trade-in trailers.  Gentry admitted that he was aware from his own experience doing repossessions that when a car is repossessed by a dealer, paperwork is generated.  Baldwin did not supply him with copies of any such paperwork.  Moreover, Gentry made no efforts to verify the legitimacy of the trailers.  He maintained that he saw no warning signs that there was anything wrong going on.  When he picked up the trailers, they were out in the open.  He acknowledged that in hindsight, he sold stolen trailers and there were indications that should have made him realize they were stolen.

{¶ 27} Gentry sold every trailer he got from Baldwin.  He admitted that he provided back stories to customers about the origin of the trailers.  Gentry testified that he

10.

made a profit on most of the trailers but did not report any of those profits in his tax returns. He collected roughly $83,000 for the roughly 40 units that he sold. He kept approximately $15,000 and gave the rest to Baldwin. He plans to amend his tax return, and he will be paying restitution to those he harmed.

{¶ 28} The jury convicted Baldwin of all four counts of the indictment. The trial court sentenced him to a prison term of eight years on Count 1, 12 months on Count 2, 12 months on Count 3, and 18 months on Count 4, to be served concurrently for an aggregate term of eight years, and a mandatory five-year period of post-release control on Count 1 and three-year optional periods of post-release control on the remaining counts. The court imposed the costs of prosecution.

{¶ 29} Baldwin appealed and assigns the following errors for our review:

I

The trial court erred in denying Appellant's Crim.R. 29 motion.

II

The jury's verdict was against the manifest weight of the evidence presented at trial.

III

The trial court committed error to the prejudice of Appellant by imposing the costs of prosecution without consideration of Appellant's present or future ability to pay.

11.

## II. Law and Analysis

{¶ 30} Baldwin challenges the sufficiency and weight of the evidence in support of his convictions. He also challenges the trial court's imposition of the costs of prosecution. We review each of Baldwin's challenges in turn.

### A. Sufficiency of the Evidence

{¶ 31} In his first assignment of error, Baldwin argues that the state failed to present sufficient evidence to support his convictions. He claims that other than the testimony of a convicted felon, Griffin, and Baldwin's co-defendant, Gentry, "there was no direct evidence regarding where or how [he] had obtained the trailers or whether he acted alone or in concert with others." He insists that these witnesses' testimony was not credible.

{¶ 32} Baldwin also maintains that Rizor "had no first-hand knowledge of [Baldwin's] actual dealings or involvement with the trailers" and that J.Mo., R.S., and T.Z., too, lacked first-hand knowledge of who stole their trailers. He complains that although T.Z. was named as the victim in Count 3 of the indictment, he never testified at trial.

{¶ 33} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668

12.

(1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 34} As to Baldwin's receiving-stolen-property convictions, under R.C. 2913.51(A), "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Gentry testified that he received all the trailers— including the three trailers, the theft of which formed the basis for the receiving-stolen-property convictions—from Baldwin. Rizor confirmed that *every single one* of these trailers had been stolen, and the parties stipulated to this fact. The question we must answer is whether the state presented sufficient evidence that Baldwin had knowledge or reasonable cause to believe that the trailers were obtained through the commission of a theft offense.

{¶ 35} It is well-established in Ohio that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. "Absent an admission by a defendant, whether there was reasonable cause for a defendant to know if an item was stolen can only be shown by circumstantial evidence." *State v. West*, 8th Dist. Cuyahoga No. 79404, 2002-Ohio-2242, ¶ 843.[1] Some factors that may be helpful in determining whether a defendant knew or should have known that property has been obtained through

---

[1] This decision contains errors in paragraph numbering.

13.

the commission of a theft offense include: "(a) the defendant's unexplained possession of the merchandise, (b) the nature of the merchandise, (c) the frequency with which such merchandise is stolen, (d) the nature of the defendant's commercial activities, and (e) the relatively limited time between the thefts and the recovery of the merchandise." *State v. Davis,* 49 Ohio App.3d 109, 112, 550 N.E.2d 966 (8th Dist.1988).

{¶ 36} Here, Gentry obtained 45 trailers from Baldwin and all 45 were stolen. Rizor's spreadsheet reveals that the VINs had been removed from 24 of them. Baldwin produced no paperwork with respect to the trailers and demanded cash payment, and while Gentry claimed not to know that the trailers had been stolen, he conceded that in hindsight, he should have realized it. In addition to this, Griffin admitted to stealing four trailers for Baldwin. In his recorded phone call to Baldwin, he offered to steal additional trailers, but Baldwin declined to accept them not because he did not wish to participate in a crime, but because he no longer had an outlet for the stolen trailers because his source—i.e., Gentry—"got locked with like three of them." This evidence, if believed, was sufficient for the jury to conclude that Baldwin knew or should have known that the trailers he was selling through Gentry—including the trailers stolen from J.Mo., T.Z., and R.S.—had been obtained by theft.

{¶ 37} While Baldwin claims that Griffin and Baldwin were not credible witnesses these issues go to the weight of the evidence—not its sufficiency. *See State v. Vickroy*, 5th Dist. Fairfield No. 17-CA-17, 2017-Ohio-9209, ¶ 16-17 (explaining that state's reliance on testimony of convicted felon went to weight—not sufficiency—of evidence);

14.

*State v. McFeeture*, 2015-Ohio-1814, 36 N.E.3d 689, ¶ 46 (8th Dist.) ("Credibility is not a consideration for us under a sufficiency of the evidence review.").

{¶ 38} As to Baldwin's conviction of engaging in a pattern of corrupt activity, under R.C. 2923.32(A)(1), "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." "Corrupt activity" is defined by R.C. 2923.32(I)(2)(c) as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in * * * [c]onduct constituting * * * [a] violation of section * * * 2913.51 * * * that is a felony of the first, second, third, or fourth degree * * *." An "enterprise" is defined by R.C. 2923.31(C) to include "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." And a "pattern of corrupt activity" is defined by R.C. 2923.31(E) to mean "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶ 39} Here, the evidence presented by the state, if believed, established that Baldwin participated with Gentry in selling 45 stolen trailers. Again, we will not evaluate Griffin and Gentry's credibility in a challenge to the sufficiency of the evidence.

{¶ 40} We find Baldwin's first assignment of error not well-taken.

15.

### B. Manifest Weight of the Evidence

{¶ 41} In his second assignment of error, Baldwin claims that his convictions were against the manifest weight of the evidence. For the most part, he relies on the same arguments advanced in support of his first assignment of error. He adds also that Rizor's testimony was "lengthy" and "confused," potentially causing difficulty for the jury.

{¶ 42} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 43} Here, the jury was informed of Griffin's criminal past and participation in the theft of trailers. It was also aware of Gentry's role in this scheme and his motives in testifying. Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify,

16.

observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. We cannot say that the jury lost its way in its credibility determinations here.

{¶ 44} As to Rizor's testimony, given the volume of trailers that were stolen and sold to third parties, his testimony was necessarily "lengthy." We do not agree, however, that it was "confused." To the contrary, Rizor was methodical in describing each transaction. His testimony was easy to follow and was conveniently summarized in a comprehensive spreadsheet that was admitted into evidence without objection. Finally, that the victims did not know who stole their trailers—and T.Z. did not testify—is of no import here, particularly given that Baldwin was not convicted of perpetrating the thefts themselves, but rather, was convicted of receiving the trailers after they had already been stolen.

{¶ 45} We find Baldwin's second assignment of error not well-taken.

## C. Costs of Prosecution

{¶ 46} In his third assignment of error, Baldwin argues that the trial court erred by imposing the costs of confinement and costs of prosecution without considering his current or future ability to pay such costs. Our standard of review on this issue is whether the imposition of costs was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b); *State v. Farless*, 6th Dist. Lucas Nos. L–15–1060 and L-15-1061, 2016-Ohio-1571, ¶ 4, citing *State v. Collins*, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 30 (12th Dist.) ("An appellate court

17.

may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law.").

{¶ 47} Baldwin's challenge to the imposition of costs is perplexing for two reasons. First, with respect to the costs of confinement, the trial court judgment does not purport to impose the costs of confinement—the trial court judgment states only that Baldwin "is ordered to pay the costs of this prosecution." Baldwin explicitly acknowledges as much in his brief ("[T]he trial court's ordered [sic] does not specify that Appellant pay the costs of confinement * * *."). It is unclear why he argues error in the imposition of costs that were never imposed.

{¶ 48} Second, with respect to costs of prosecution, R.C. 2947.23(A)(1)(a) provides that "[i]n all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution * * * and render judgment against the defendant for such costs." As we have repeatedly acknowledged, the trial court is obligated to impose the costs of prosecution without first finding that the defendant is able to pay such costs. *See State v. Trimpe*, 6th Dist. Wood No. WD-18-048, 2019-Ohio-3017, ¶ 29; *State v. Dotson*, 6th Dist. Wood No. WD-15-060, 2016-Ohio-8085, ¶ 23; *State v. Tucker*, 6th Dist. Wood No. WD-16-063, 2018-Ohio-1869, ¶ 37; *State v. Hughes,* 6th Dist. Wood No. WD-16-056, 2018-Ohio-1237, ¶ 64. Again, Baldwin acknowledges this point in his brief ("[U]nder R.C. 2947.23, the trial court is required to assess court costs.").

18.

{¶ 49} Because the court did not impose costs of confinement, and because it was obligated to impose the costs of prosecution without finding that Baldwin was able to pay, we find Baldwin's third assignment of error not well-taken.

### III. Conclusion

{¶ 50} The state offered sufficient evidence to support Baldwin's convictions of receiving stolen property and engaging in a pattern of corrupt activity. Circumstantial evidence was offered that Baldwin knew or had reason to believe that the 45 trailers he provided for sale through Gentry had been obtained by theft. Moreover, that one of the state's witnesses was a convicted felon and another was a co-defendant were credibility issues that went to the weight—not the sufficiency of the evidence. We find Baldwin's first assignment of error not well-taken.

{¶ 51} Baldwin's convictions were not against the manifest weight of the evidence. The jury—who had the advantage of seeing the witnesses testify and observing their demeanors—did not lose its way in making credibility determinations in favor of the state. And the investigator who testified for the state provided easy-to-follow testimony that was conveniently summarized in a spreadsheet that was admitted into evidence. We find Baldwin's second assignment of error not well-taken.

{¶ 52} Finally, the court did not impose costs of confinement and was not required to make a finding that Baldwin had the ability to pay before imposing the costs of prosecution. We find Baldwin's third assignment of error not well-taken.

19.

**{¶ 53}** We affirm the July 25, 2018 judgment of the Wood County Court of

Common Pleas.  Baldwin is ordered to pay the costs of this appeal under App.R. 24.


Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                         _____

                                                           JUDGE

Arlene Singer, J.

                                          _____

Christine E. Mayle, J.                               JUDGE
CONCUR.


                                          _____

                                                           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.