[Cite as *State v. Baldwin*, 2021-Ohio-84.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. WD-18-064

    Appellee                                 Trial Court No. 2017CR0507

v.

Kevin Ray Baldwin                        **DECISION AND JUDGMENT**

    Appellant                                Decided:  January 15, 2021

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Donald Gallick, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} This case is before the court upon the reopened appeal of defendant-

appellant, Kevin Ray Baldwin, from the July 25, 2018 judgment of the Wood County

Court of Common Pleas.  For the reasons that follow, we reverse.

## I. Background

{¶ 2} The facts of this case were thoroughly summarized in *State v. Baldwin*, 6th Dist. Wood No. WD-18-064, 2020-Ohio-699. We recite them again here before addressing the additional assignments of error that we allowed Baldwin to argue in this reopened appeal.

### A. Factual Background

{¶ 3} According to the evidence presented by the state at trial, Kevin Baldwin and co-defendant, William Gentry, perpetrated a scheme to sell stolen trailers. Baldwin would acquire a stolen trailer. He would then contact Gentry to let him know that he had a trailer available and how much he expected to be paid for the trailer. Gentry would pick the trailer up from Baldwin, facilitate the sale of the trailer at a price that would allow him to make a profit, then pay Baldwin their previously agreed-upon price. In all, 45 trailers were stolen from their rightful owners and sold to third parties.

{¶ 4} Baldwin was charged in a four-count indictment with engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1) and (B)(1) (Count 1); two counts of receiving stolen property, violations of R.C. 2913.51(A) and (C) (Counts 2 and 3); and receiving stolen property, a violation of R.C. 2913.51(A) and (C) (Count 4).

{¶ 5} Count 1 was premised on four incidents: (1) the July 8, 2016 theft of a Haulin trailer, vehicle identification number ("VIN") 5NHUHAV22DW065443 ("the Haulin trailer"), with a 1973 Honda CB450 motorcycle stored inside, stolen

2.

from Walbridge, Wood County, Ohio; (2) the July 11, 2016 theft of a homemade 16-foot-by-two-foot axel trailer ("the homemade trailer"), stolen from Walbridge, Wood County, Ohio; (3) the August 19, 2016 theft of a 28-foot trailer, VIN 1L9723T55G1317973 ("the 28-foot trailer"), with a snowmobile stored inside, stolen from Perrysburg, Wood County, Ohio; and (4) the theft of 42 additional trailers stolen in Northwest Ohio and Southeast Michigan over the period of November 23, 2013, to June 2017.

{¶ 6} Count 2 was premised on the July 8, 2016 theft of the Haulin trailer from its owner, J.Mo. Count 3 was premised on the July 11, 2016 theft of the homemade trailer from its owner, T.Z. And Count 4 was premised on the August 19, 2016 theft of the 28-foot trailer from its owner, R.S.

{¶ 7} The case was tried to a jury on July 18-20, 2018. The state presented testimony from C.J., J.M., J.Mo., S.B., T.H., and R.S., six men whose trailers were stolen; Sean Rizor, an investigator with the Ohio Bureau of Motor Vehicles ("BMV") assigned to the Ohio State Highway Patrol's vehicle theft unit; Michael Griffin, who admitted to stealing four trailers that he sold to Baldwin; and Gentry.

## 1. C.J.

{¶ 8} C.J. testified that he owns his own electrical contracting company. He purchased a 24-foot trailer in 2015 or 2016, for approximately $11,000-$13,000, which he used both personally and professionally. His trailer was registered and titled with the BMV. It had a custom epoxy floor. C.J. stored the trailer—which was locked—at his shop in Toledo in a fenced-in yard secured with a lock. It was stolen in July of 2016.

3.

There were items in the trailer, including a winch, battery, jack, and straps. The trailer was eventually recovered by the Woodville Police Department. The items in the trailer were never returned. C.J. does not know who stole the trailer.

## 2. J.M.

{¶ 9} J.M. is employed by a company that performs asbestos removal, lead abatement, sandblasting, and other such services. The company owned a very distinctive trailer that provided employees with a space to remove contaminated clothing and to shower after work. It had air and water filtration systems stored under the floor, so the trailer stood a little taller than most. The filtered water was released from the trailer through a drain line that connects to the sewer and visibly protrudes from the side of the trailer.

{¶ 10} J.M. testified that around 7:00 a.m. on December 29, 2016, he arrived at work to find that the trailer was missing. He filed a report with the Toledo Police Department and contacted the president of the company. Given the value of the equipment housed in the trailer, the president suggested that J.M. scour the area to try to find it. J.M. devoted most of December 29, 2016, to driving around the city of Toledo searching for the trailer. On December 30, 2016, J.M. was driving home down State Route 20 through Woodville, Ohio, when he looked to his left and saw the company's trailer sitting next to a barn just outside of town on the property of William Gentry, who J.M. had known for many years. J.M. was sure it was his company's trailer because he could see the drain sticking out of the side. He went to the Woodville Police Department

4.

and reported that he found the trailer. J.M. conceded that he does not know how Gentry got the trailer.

### 3. J.Mo.

{¶ 11} J.Mo. testified that he owned an eight-and-one-half-by-20-foot trailer that he used for hauling motorcycles. He paid $4,000 for it. He painted the inside of it orange and black. He stored it in Moline in Wood County, Ohio, with locks on every door. On July 8, 2016, he noticed that it had been stolen. He reported it to the Lake Township Police Department. There was a 1973 Honda motorcycle in it when it was stolen. J.Mo. had also been using the trailer to store memorabilia that he received from his father, who had recently passed away. There were photos, scrapbooks, death certificates, and mementos from his uncle who had been killed in Vietnam. The trailer was recovered by the State Highway Patrol in May of 2017, but the contents were never located.

### 4. S.B.

{¶ 12} S.B. purchased a seven-by-14-foot Stealth trailer on August 17, 2015, for $3,920.94. He was using it to move from Michigan to Lima, Ohio. He had items stored in it, including antique guns and personal household goods that belonged to his son who had been deployed. The contents had a value of approximately $23,000. S.B. was storing the trailer, locked, at his church in Lambertville, Michigan. The trailer went missing in June of 2016. It was recovered in May of 2017. The only item returned to

5.

him from the trailer was one of the firearms, which the Toledo Police Department had seized during a raid of a home.

### 5. T.H.

{¶ 13} T.H. purchased a 16-foot Stealth trailer on April 28, 2016, that he used for his lawn care business. It was stolen from his home in Maumee, Ohio, with his lawn equipment inside. Between the trailer and the contents, the value was approximately $30,000. The trailer was eventually recovered in Findlay, Ohio, but the contents were gone. T.H. does not know who took it.

### 6. R.S.

{¶ 14} R.S. owned a 24-foot Thunder Snow trailer that he parked at his home in Lake Township, Wood County, Ohio. He stored his snowmobile in it. It was stolen in December of 2016. A year or so later, the trailer was recovered, but the snowmobile was not.

### 7. Sean Rizor

{¶ 15} Rizor became involved in this case on February 20, 2017. At that point, it had been discovered that Gentry had sold three stolen trailers, including J.M.'s customized decontamination trailer. Rizor knew Gentry. He was the owner of Gentry Auction. Gentry is a licensed auctioneer, but he also locates and transports cars for motor vehicle dealers. Although not a licensed dealer himself, Gentry sold vehicles and trailers out of the front yard of his home. He had been warned in the past that given the volume of vehicles he was selling, he could be prosecuted for doing so without a license.

6.

{¶ 16} Soon after becoming involved in the investigation, Rizor witnessed Gentry hauling a trailer with a license plate designating that it was a homemade trailer when it was clear that the trailer he was hauling had been manufactured by PJ Trailer. Gentry was stopped, and Rizor discovered that the VIN that was legally required to be on the trailer had been removed. Using a concealed VIN ("con-VIN") from the trailer, Rizor was able to determine that the trailer was stolen. Gentry was asked how long he had had the trailer and he said two years. Records showed that the trailer had actually been stolen seven months earlier.

{¶ 17} Rizor decided to get a search warrant for Gentry's records, including his receipt books, but ultimately Gentry's wife relinquished the receipt books voluntarily. There were two kinds of receipts in the books obtained from Gentry: (1) receipts reflecting his purchase of each trailer from Baldwin, and (2) receipts reflecting his sale of each trailer to a third party.

{¶ 18} The receipts reflecting Gentry's purchase of each trailer from Baldwin identified the date the trailer was purchased, a description of the trailer (but no VIN), the purchase price, the method of payment (always cash), and sometimes a signature or initials signifying Baldwin's receipt of the cash. The receipts reflecting Gentry's sale of trailers to third parties identified the purchaser's name and sometimes their address, a description of the trailer (but never the VIN), the price for which it was sold, the method of payment (cash or check), and the seller's name (either Gentry or his wife).

7.

{¶ 19} Rizor traced each of the trailers sold by Gentry and determined that 45 had been stolen. In many cases, VINs had been removed, so trailers had to be identified using con-VINs or from other information. Rizor compiled a spreadsheet identifying information about each trailer, including the purchaser, the person from whom the trailer was stolen, the make, model, year, and VIN of the trailer, whether, when, and from where the trailer was recovered, and the agency to which the theft was reported. Examining phone records, Rizor also observed that on or about the dates of the thefts, there was frequent communication between Baldwin, the Gentrys, and Michael Griffin, a man who had been prosecuted in Sylvania Municipal Court for stealing trailers. The frequency of these contacts is also noted in his spreadsheet. Rizor methodically explained each entry in the spreadsheet at trial.

{¶ 20} Rizor testified about his communication with Griffin. The Lucas County Sheriff's office put him in contact with Griffin after he had been prosecuted in Sylvania Municipal Court. Griffin admitted to Rizor that he stole trailers with and on behalf of Baldwin. At Rizor's request, Griffin placed a call to Baldwin—with Rizor listening and recording— and told Baldwin that he needed extra money and had a couple of trailers available. Baldwin said that he could not do anymore trailers because his "source got locked with like three of them" and he had no outlet for them anymore. A recording of this call was played for the jury.

8.

### 8.  Michael Griffin

{¶ 21} Michael Griffin has a criminal record.  He has served prison time for receiving stolen property and for drug-related offenses.  Griffin testified that on approximately four occasions, he stole trailers, sold them to Baldwin, and delivered them to Baldwin's residence.  Consistent with Rizor's testimony, Griffin explained that in cooperation with Rizor, he called Baldwin from his cell phone.  Griffin told Baldwin that he needed extra money and had a couple of trailers available.  Baldwin said that he could not do anymore trailers because his "source got locked with like three of them" and he had no outlet for them anymore.  Griffin asked if there was anything else he had an outlet for, and Baldwin responded that he could use some four-wheelers and dirt bikes.

{¶ 22} Griffin testified that he received a phone call and text messages from Baldwin's brother the night before his trial testimony, threatening that something would happen if he testified and calling him an "undercover police snitching bitch."  Although no physical threat was made, Griffin found Baldwin's brother's text messages to be threatening.

### 9.  William Gentry

{¶ 23} Gentry testified that like Baldwin, he was charged in this case with engaging in a pattern of corrupt activity and receiving stolen property.  His wife was also charged.  He entered into a plea agreement with the state pursuant to which he would enter a plea of guilty to engaging in a pattern of corrupt activity and the state would dismiss the charges against his wife.  He entered the plea in large part to protect his wife.

9.

Gentry had not yet been sentenced, but was facing two to eight years in prison. He explained that he offered to testify in the case, not as part of that plea agreement, but rather "to get it off of [his] chest of what happened so that other people would know what happened to [him]." Gentry acknowledged that he had victimized a lot of people.

{¶ 24} Gentry testified that he has been acquainted with Baldwin for 20 years. Baldwin worked at K & K, a dealership owned by a relative of Baldwin. They had done hundreds of transactions together. In May or June of 2016, Baldwin asked him if he was interested in selling trailers. Gentry said that he was as long as he could make a profit. Baldwin would take pictures of trailers and send them to Gentry's wife (who had a smartphone), along with the price he was charging. Gentry would pick the trailer up from the lot next to Baldwin's daughter's home. Gentry marked up the price on each trailer based on what he believed to be a reasonable profit.

{¶ 25} Gentry did not have the cash to pay Baldwin up front, so Gentry would sell the trailer, then pay Baldwin the agreed-upon price after completing the sale. Baldwin required to be paid in cash. If Gentry accepted a check from a customer, he would wait until it cleared, then pay Baldwin. Baldwin would come to Gentry's home to get the cash. If the Gentrys were home, they would have Baldwin sign a receipt; sometimes Baldwin would sign only his initials. If they were not home, they would leave the cash in a cushion of a chair on their porch and Baldwin would pick it up. Gentry identified Baldwin's signature.

10.

**{¶ 26}** When he first agreed to sell trailers from Baldwin, Gentry told Baldwin that he would need receipts. Baldwin agreed, but never provided the receipts, so Gentry made his own. He acknowledged that he did not mark down VINs on the receipts. He claimed that VINs were "inconsequential" to him because almost all of the trailers weighed less than 4,000 pounds. (Rizor had previously explained that trailers that weigh less than 4,000 pounds do not need to be titled.) Gentry insisted that 90 percent of the trailers had the VIN intact, but acknowledged that some did not.

**{¶ 27}** Gentry did not know where Baldwin got the trailers or whether they were stolen. Baldwin told him at one time that he had an "in" with a guy who dealt in repossessed and trade-in trailers. Gentry admitted that he was aware from his own experience doing repossessions that when a car is repossessed by a dealer, paperwork is generated. Baldwin did not supply him with copies of any such paperwork. Moreover, Gentry made no efforts to verify the legitimacy of the trailers. He maintained that he saw no warning signs that there was anything wrong going on. When he picked up the trailers, they were out in the open. He acknowledged that in hindsight, he sold stolen trailers and there were indications that should have made him realize they were stolen.

**{¶ 28}** Gentry sold every trailer he got from Baldwin. He admitted that he provided back stories to customers about the origin of the trailers. Gentry testified that he made a profit on most of the trailers but did not report any of those profits in his tax returns. He collected roughly $83,000 for the roughly 40 units that he sold. He kept

11.

approximately $15,000 and gave the rest to Baldwin. He plans to amend his tax return, and he will be paying restitution to those he harmed.

{¶ 29} The jury convicted Baldwin of all four counts of the indictment. The trial court sentenced him to a prison term of eight years on Count 1, 12 months on Count 2, 12 months on Count 3, and 18 months on Count 4, to be served concurrently for an aggregate term of eight years, and a mandatory five-year period of postrelease control on Count 1 and three-year optional periods of postrelease control on the remaining counts. The court imposed the costs of prosecution. Baldwin's conviction and sentence were memorialized in a judgment journalized on July 25, 2018.

## B. Baldwin's Original Appeal

{¶ 30} Baldwin appealed the court's July 25, 2018 judgment, assigning three errors.

{¶ 31} In his first assignment of error, Baldwin argued that the state failed to present sufficient evidence to support his convictions. He claimed that other than the testimony of a convicted felon and his co-defendant—whose testimony he claimed was not credible—"there was no direct evidence regarding where or how [he] had obtained the trailers or whether he acted alone or in concert with others." He also argued that the victims and BMV investigator who testified at trial lacked firsthand knowledge of his "actual dealings or involvement with the trailers," and complained that one of the victims did not testify.

12.

{¶ 32} In his second assignment of error, Baldwin claimed that his convictions were against the manifest weight of the evidence, primarily for the same reasons advanced in support of his first assignment of error. He added that the BMV investigator's testimony was "lengthy" and "confused," potentially causing difficulty for the jury.

{¶ 33} In his third assignment of error, Baldwin argued that the trial court erred by imposing the costs of confinement and costs of prosecution without considering his current or future ability to pay such costs.

{¶ 34} In a decision and judgment released on February 28, 2020, we found Baldwin's three assignments of error not well-taken and we affirmed. *Baldwin*, 6th Dist. Wood No. WD-18-064, 2020-Ohio-699.

### C. Baldwin's Application for Reopening

{¶ 35} On May 26, 2020, Baldwin filed an application for reopening under App.R. 26(B). He identified three additional assignments of error that his original appellate counsel failed to raise:

> Proposed Assignment of Error IV
>
> THE TRIAL COURT COMMITTED AN ABUSE OF
>
> DISCRETION IN DENYING THE MOTION FOR A MISTRIAL
>
> WITHOUT ARGUMENT AND WITHOUT A SIDEBAR AS THE SOLE
>
> PURPOSE OF THE WITNESS WAS TO SUGGEST DEFENDANT'S

13.

BROTHER WAS THREATENING THE WITNESS ON DEFENDANT'S BEHALF.

Proposed Assignment of Error V

TRIAL COUNSEL WAS INEFFECTIVE AND DEFENDANT SUFFEED [sic] FROM PLAIN ERROR BY COUNSEL'S FAILURE TO INFORM THE TRIAL COURT THAT THE FIRST-DEGREE FELONY CONVICTION WAS A SECOND-DEGREE OFFENSE UNDER OHIO LAW.

Proposed Assignment of Error VI

TRIAL COUNSEL WAS INEFFECTIVE AND DEFENDANT SUFFERED FROM PLAIN ERROR BY COUNSEL'S FAILURE TO INFORM THE TRIAL COURT THAT THE FOURTH-DEGREE FELONY CONVICTION FOR RECEIVING STOLEN PROPERTY COULD ONLY BE A FIFTH DEGREE FELONY AS THE STATE'S WITNESS OFFERED NO TESTIMONY REGARDING THE VALUE OF THE STOLEN TRAILER.

{¶ 36} In a decision and judgment released on July 1, 2020, we granted Baldwin's application with respect to his proposed fourth and fifth assignments of error. *State v. Baldwin*, 6th Dist. Wood No. WD-18-064, 2020-Ohio-3895. The matter was re-briefed and is now decisional.

14.

## II. Law and Analysis

{¶ 37} When the state asked Griffin if he had received threats before his trial testimony, Baldwin's counsel objected, moved for a mistrial, and requested a sidebar. The trial court overruled his objection and denied his motion for a mistrial and request for a sidebar. In his fourth assignment of error, Baldwin argues that this was error.

{¶ 38} Baldwin was convicted of engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1) and (B)(1), a first-degree felony. But R.C. 2923.32(B)(1) provides that "[e]xcept as otherwise provided in this division, engaging in corrupt activity is a felony of the *second* degree." (Emphasis added.) Only under specific circumstances may it constitute a first-degree felony. In his fifth assignment of error, Baldwin argues that the trial court erred when it convicted him of first-degree engaging in a pattern of corrupt activity.

### A. Admission of Threats Against Trial Witness

{¶ 39} Baldwin argues that the trial court erred when it overruled his objection to testimony concerning alleged threats made against Griffin by Baldwin's brother, denied a motion for mistrial premised on the admission of that testimony, and refused defense counsel's request for a sidebar. Baldwin maintains that he should be granted a new trial.

{¶ 40} In concluding its direct examination of Michael Griffin, the state asked Griffin if he had received threats in connection with testifying at trial: "Q: * * * Have you been threatened by your coming here to testify today?" Baldwin's attorney immediately objected, asked for a mistrial, and asked to approach. The trial court flatly

15.

denied counsel's requests: "The court: No. Overruled." Griffin then responded that yes, he had been threatened. The state asked no further questions.

{¶ 41} Lest the jury be left with the impression that *Baldwin* had threatened Griffin, defense counsel asked him on cross who had threatened him:

Q: Who threatened you?

A: Mr. Baldwin's brother, Rodney.

Q: How did he threaten you?

A: He told me that something was going to happen to me if I came and testified. He called me on my phone last night.

{¶ 42} Griffin then explained that he had also received threatening text messages:

A: I got a text message from his cell phone.

Q: What does it say?

A: Can you give me one second?

Q: Sure.

A: I will turn it back on. Would you like to see it?

Q: If you don't mind.

The court: [P]ut it on the overhead there and then everybody can see.

The messages read: "Bro, I'm trying to call you, you undercover police snitching bitch," and "Bro, you see I am trying to call you, you undercover police snitching bitch."

16.

{¶ 43} Baldwin argues that the trial court erred in admitting the evidence, denying his motion for mistrial, and refusing his request for a sidebar.  He maintains that the evidence had no probative value and was unduly prejudicial and the error in admitting the evidence deprived him of a fair trial.  He argues that admission of the evidence concerning threats against Griffin requires reversal here.

{¶ 44} The admission of evidence and the decision to grant or deny a mistrial are matters within the discretion of the trial court.  *See State v. Lyles*, 42 Ohio St.3d 98, 99, 537 N.E.2d 221 (1989); *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92.  We generally review a challenge to the admission of evidence or denial of a motion for mistrial under an abuse-of-discretion standard.  An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 45} Ohio courts recognize that threats against witnesses by persons other than the accused may be admissible against the accused under certain circumstances.  For instance, they may be admitted to demonstrate why a witness's story has changed or why a witness did not immediately come forward to police.  *State v. Grimes*, 1st Dist. Hamilton No. C-030922, 2005-Ohio-203, ¶ 56.  They may also be admitted as evidence of consciousness of guilt *if* it is shown that the accused was connected to such threats.  *See id*. at ¶ 55; *State v. Williams*, 8th Dist. Cuyahoga No. 89461, 2008-Ohio-1948, ¶ 25.

{¶ 46} Here, there is no indication that Baldwin was involved in the threats that his brother made against Griffin or that there was some other legitimate purpose for

17.

offering evidence of those threats. The evidence was, therefore, not admissible under Evid.R. 402. Moreover, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury under Evid.R. 403(A). Accordingly, we find that the trial court abused its discretion in admitting Baldwin's brother's threats against Griffin. *See, e.g., State v. Harris*, 2d Dist. Montgomery No. 11053, 1989 WL 94552, *4-5 (Aug.16, 1989) (concluding that trial court erred in admitting testimony of victim's mother and brother that they received phone calls threatening harm to the family if the case against defendant went forward); *State v. Brown*, 2d Dist. Montgomery No. 24420, 2012-Ohio-416, ¶ 36 (concluding that testimony concerning threats against witness by defendant's family "was clearly prejudicial, wholly irrelevant, and unsubstantiated on this record"). We note that this error was compounded when the trial court insisted that the texts be displayed for the jury.

{¶ 47} Having concluded that this evidence should have been excluded, we must next determine whether its admission requires reversal or whether it constituted harmless error. Under R.C. 2945.83(C), no judgment of conviction shall be reversed in any court "because of * * * [t]he admission * * * of any evidence offered against * * * the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby[.]" Similarly, under the harmless error rule—Crim.R. 52(A)—"[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

18.

{¶ 48} In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, the Ohio Supreme Court explained the analysis that must be performed in a harmless-error inquiry, and, more specifically, in determining whether an error has affected a defendant's "substantial rights." It recognized that error affecting a defendant's "substantial rights" "has been interpreted to require that the error must have been *prejudicial*." (Internal quotations omitted.) *Id.* at ¶ 23. To determine that error is prejudicial requires an appellate court to "declare a belief that the error was not harmless beyond a reasonable doubt." *Id.* at ¶ 28. An error in the admission of evidence is harmless only when "there is no reasonable possibility that the testimony contributed to the accused's conviction." *Id.* at ¶ 28. Thus, the court must evaluate "both the impact that the offending evidence had on the verdict and the strength of the remaining evidence." *Id.* at ¶ 25-26. If after excising the improper evidence from the record, there remains "overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction," the error will be deemed harmless. *Id.* at ¶ 29, 32.

{¶ 49} The state has the burden to prove that the error in the admission of evidence did not affect the defendant's substantial rights. *See also State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15 ("[T]he *government* bears the burden of demonstrating that [an] error did not affect the substantial rights of the defendant."). (Emphasis added.) If the state fails to satisfy its burden, the appellate court must reverse the conviction. *Perry* at i*d.*

19.

**{¶ 50}** Before we examine the state's arguments here, we briefly summarize the conclusions reached in other Ohio cases where witnesses have testified to receiving threats that were not determined to have been made by the defendant or at his or her direction.

**{¶ 51}** In *State v. Harris*, 2d Dist. Montgomery No. 11053, 1989 WL 94552, *4-5, Harris was convicted of attempted rape and corrupting another with drugs. At trial, the court allowed the victim's mother and brother to testify that they received various phone calls from unknown individuals who threatened to harm the family if the case against defendant was not dropped. The victim's mother also testified that her nephew called and told her that Harris wanted to know if she needed money to drop the charges. Harris argued that the trial court erred in admitting the testimony because the calls from unknown individuals were not properly authenticated, the call from the nephew was hearsay, and the probative value of the evidence was outweighed by its danger of unfair prejudice.

**{¶ 52}** The court agreed that the evidence should not have been admitted, but it found that with respect to the drug charges, admission of the evidence was harmless beyond a reasonable doubt because the evidence of Harris's guilt was "extremely compelling." With respect to the attempted rape charge, however, the court found that "[t]he testimony * * * [was] not nearly as compelling." *Id.* at *6. It concluded that "admission of the improperly admitted testimony was not harmless beyond a reasonable doubt" and required reversal and remand for a new trial on that charge. *Id.*

20.

{¶ 53} In *State v. Brown*, 2d Dist. Montgomery No. 24420, 2012-Ohio-416, a witness testified to threats received by the defendant's family. Defense counsel objected, the objection was sustained, and the trial court gave the jury a curative instruction, but counsel did not move for a mistrial. On appeal, the court found that the testimony "was clearly prejudicial, wholly irrelevant, and unsubstantiated on this record," and that counsel was deficient in failing to move for a mistrial. *Id.* at ¶ 36. It also found that the trial court's curative instruction was insufficient. The court found that this error, combined with the admission of testimony concerning the defendant's past criminal history to which counsel did not object, required reversal, particularly given that the evidence against the defendant was not otherwise overwhelming.

{¶ 54} Here, the state insists that the evidence was relevant—we have already determined otherwise—and it argues that the evidence was not unfairly prejudicial and that the evidence against Baldwin was overwhelming such that reversal is not required here. The state's position is premised on essentially two points: (1) that defense counsel himself examined Griffin about the threatening messages he received, then displayed those text messages to the jury; and (2) that this court already found the evidence against Baldwin to be "plentiful."

{¶ 55} To begin with, the state suggests that it was defense counsel's choice to question Griffin about the messages he received from Baldwin's brother. The state claims: "Baldwin's defense counsel immediately followed [the denial of the mistrial] by cross-examining Baldwin's co-defendant and even had the text message that contained

the threat displayed to the jury." This is misleading. First, we must correct the state—Griffin was not Baldwin's co-defendant; he was a state's witness. Second, the *trial court*—not Baldwin—insisted upon displaying the text messages to the jury. And third, a review of the record (recited above) reveals that Baldwin's counsel was left with no choice but to cross-examine Griffin about the text messages lest the jury conclude—as it would appear was the state's intention—that *Baldwin* himself threatened Griffin.

{¶ 56} As to our supposed characterization of the evidence as "plentiful," what we, in fact, stated was that given the number of trailers here, Rizor's testimony was necessarily "lengthy." Describing a witness's testimony as "lengthy" is not the same as finding that the evidence was "plentiful."

{¶ 57} We now turn to the issue of whether the state has met its burden of showing that the error here did not affect Baldwin's substantial rights. To establish the mens rea necessary to convict Baldwin of the offenses charged here, the state presented evidence that required the jury to draw certain inferences.

{¶ 58} First, the state presented evidence that Gentry sold approximately 45 stolen trailers—some of which had VINs that were tampered with and none of which had accompanying paperwork—and Gentry obtained all of these trailers from Baldwin. The state expected the jury to infer that it cannot be mere coincidence that all of the inventory Baldwin supplied to Gentry was obtained by theft.

{¶ 59} Second, the state presented evidence that Griffin stole four trailers for Baldwin, and an analysis of phone records shows that on four dates—close in time to

22.

when four of the trailers were reported stolen—Baldwin and Griffin exchanged phone calls. The state expected the jury to infer that because Griffin stole four of the trailers for Baldwin, Baldwin must have known that the other 42 trailers (including the trailers specifically identified in Counts 2, 3, and 4 of the indictment) were stolen by someone.

{¶ 60} In Baldwin's original appeal, we found this evidence sufficient to support Baldwin's conviction. We also found that the jury's verdict was not against the manifest weight of the evidence. But these are significantly different standards than the one we must apply here. Here, we must consider the impact of improperly-admitted evidence, and we must specifically consider whether *the state* has met its burden to show that Baldwin's substantial rights were not affected. Given its view that the evidence was not improperly admitted, the state's "substantial rights" analysis is wanting. It contends simply that while the evidence was prejudicial, it was not *unfairly* prejudicial. It also suggests that because the evidence in the case was "not scintillating," the jury's verdict was not based on emotion—this is how the state distinguishes the cases cited in our decision reopening this appeal.

{¶ 61} Regardless of whether the evidence was "scintillating," Griffin's testimony was important to establishing Baldwin's knowledge that the trailers were obtained by theft. That Baldwin's brother sought to prevent Griffin from testifying may have led the jury to believe that it was more likely that Griffin was telling the truth. While we recognize that the state offered an audio recording of a telephone conversation between Griffin and Baldwin, that recording was subject to some interpretation and did not

23.

provide the same clarity that Griffin's testimony provided. Because of the importance of Griffin's testimony, we cannot "declare a belief that the error was not harmless beyond a reasonable doubt."

{¶ 62} Accordingly, we conclude that the state has failed to demonstrate that prejudice did not result to Baldwin, that admission of the evidence was harmless beyond a reasonable doubt, and that the evidence of Baldwin's guilt was otherwise overwhelming. In other words, we cannot say that the state met its burden of showing that Baldwin's substantial rights were not affected.

{¶ 63} We find Baldwin's fourth assignment of error well-taken.

## B. The Degree of the Offense

{¶ 64} In his fifth assignment of error, Baldwin argues that the trial court erred when it convicted him of first-degree engaging in a pattern of corrupt activity. The state concedes that the verdict form for the engaging in a pattern of corrupt activity conviction failed to specify information necessary to enhance the degree of the offense from a second-degree felony to a first-degree felony. In light of our resolution of Baldwin's fourth assignment of error, we dismiss as moot Baldwin's fifth assignment of error.

## III. Conclusion

{¶ 65} We find Baldwin's fourth assignment of error well-taken. The trial court abused its discretion when it permitted the state to present evidence that Baldwin's brother threatened Griffin. Baldwin was not shown to have been involved in those threats, and the threats were not offered for some other proper purpose such as to explain

24.

why a witness's story had changed or why a witness did not immediately come forward to police. Reversal is required because the state failed to prove that the error in admitting the evidence did not affect Baldwin's substantial rights.

{¶ 66} We dismiss as moot Baldwin's fifth assignment of error.

{¶ 67} We reverse the July 25, 2018 judgment of the Wood County Court of Common Pleas and remand for a new trial. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Arlene Singer, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.