[Cite as *State v. Berry*, 2024-Ohio-5970.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-23-1209

    Appellee                                          Trial Court No.  CR0202202536

v.

Chris Berry                                          **DECISION AND JUDGMENT**

    Appellant                                          Decided:  December 20, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Chris Berry, appeals the August 22, 2023 judgment of the Lucas County Court of Common Pleas, convicting him of murder and felonious assault, with accompanying firearm specifications.  For the following reasons, we affirm the trial court judgment.

# I. Background

{¶ 2} Chris Berry was indicted in connection with the August 26, 2022 shooting death of C.C. He was charged with (1) aggravated murder, a violation of R.C. 2903.01(B) and (G) (Count 1); aggravated robbery, a violation of R.C. 2911.01(C) and (F) (Count 2); murder, a violation of R.C. 2903.02(B) and 2929.02 (Count 3), and felonious assault, a violation of R.C. 2903.11(A)(2) and (D) (Count 4). All counts carried firearm specifications under R.C. 2941.145(A), (B), (C), and (F). The case was tried to a jury beginning August 1, 2023. The State presented the following evidence.

{¶ 3} On August 25, 2022, C.C. stayed the night at the home of his friend, De.B., who lived at Artis Place Apartments. He left De.B.'s apartment on August 26, 2022, around 12:05 p.m., and was going to be picked up by his ex-girlfriend, J.P. De.B. saw C.C. out the back door, and it appeared to her that he was asking someone for directions. He disappeared from her view, and she went upstairs to her apartment. Shortly thereafter, De.B. heard three gunshots. She called C.C. and he told her he had been shot. De.B. could hear someone in the background telling him he would be okay. She rushed outside and found C.C. on the ground. De.B. said that C.C. had a concealed carry license and when he was at her apartment, he had his gun with him. When she saw him lying on the ground after being shot, his gun was not there.

{¶ 4} C.C.'s ex-girlfriend, J.P., arrived at Artis Place to pick him up and was on the phone with him when he was shot. She heard three gunshots, then the phone went

silent. J.P. found C.C. about 30 to 60 seconds later. De.B. was walking up to C.C. at the same time that J.P. approached. C.C. was lying face down on the ground.

{¶ 5} Numerous residents of Artis Place called 9-1-1 to report the shooting. When emergency crews arrived at the scene, C.C. was in and out of consciousness. At some point, he stopped breathing altogether. Efforts to resuscitate him failed, and he was pronounced dead at the hospital at 1:03 p.m. The Lucas County Coroner testified that C.C. died of a gunshot wound that entered his chest and exited his back. He estimated that C.C. was shot from at least four feet away. The murder weapon was never recovered, nor was C.C.'s gun. Three shell casings were found at the scene. A magazine, which was believed to belong to C.C.'s .40 caliber Glock, was also found at the scene. The shell casings were swabbed for DNA, but there was insufficient data to produce a DNA profile.

{¶ 6} Officers canvased the area and tried to speak with witnesses, but most people at the scene were either uncooperative or did not see anything. One onlooker, T.P., initially refused to cooperate and was behaving obstinately, but he spoke with officers after they handcuffed him and placed him in a patrol vehicle. T.P. explained that he had been afraid to cooperate.

{¶ 7} T.P. was one of the 9-1-1 callers. He said that he was in his apartment talking to his daughter's teachers (presumably via phone or computer). He heard two to four shots and ran to his back door to see what was going on. T.P. saw C.C. to his left, on the ground convulsing. To his right, he saw Berry running away. T.P. testified that he

3.

had never seen C.C. before, but he knew Berry as "Flex." T.P. saw the heel of a gun in Berry's waistband.

{¶ 8} T.P. testified that he did not hear any yelling or commotion before hearing the gunshots, and no one else was around when he looked outside his door. Ten to 20 minutes before hearing the gunshots, however, T.P. saw a group of people in the courtyard. Less than ten minutes after hearing the gunshots, T.P. saw a tall, light-skinned Black male named Rayshawn standing over C.C. T.P. said that when the police arrived, Berry was in the crowd shouting at paramedics to help C.C.

{¶ 9} Another resident of Artis Place, Da.B., testified that she witnessed the shooting. She was at the complex's playground, about 100 feet away, with her four-year-old daughter. She heard arguing, looked over, and saw a group of people, including Berry, who she knew as "Flex." Da.B. saw C.C. put his hands up and turn to walk away. After he turned, Berry shot him. Afterwards, Berry stood over C.C., and it appeared to Da.B. that he was taking C.C.'s picture with a cellphone. When police arrived at the scene, Da.B. saw Berry in the crowd on a bicycle. Da.B. said that she was 100 percent certain that Berry was the shooter.

{¶ 10} Da.B. did not immediately speak with police. Like T.P., she said that she was afraid to cooperate. Instead, she approached an officer later in the evening while attending a concert at Promenade Park. The officer put Da.B. in touch with the detective assigned to the case, and Da.B. was interviewed at the Safety Building. She identified Berry's picture in a photo array.

4.

{¶ 11} The jury found Berry not guilty of aggravated murder (Count 1) and aggravated robbery (Count 2). It found him guilty of murder (Count 3) and felonious assault (Count 4), as well as the accompanying firearm charges. The trial court found that Counts 3 and 4 merged for purposes of sentencing. It imposed a prison term of 15 years to life, plus three years on the firearm specifications attached to each count, to be served consecutively to each other.

{¶ 12} Berry appealed. He assigns the following errors for our review:

> FIRST ASSIGNMENT OF ERROR
>
> THE TRIAL COURT ERRED IN DENYING APPELLANT'S CRIM.R. 29 MOTION.
>
> SECOND ASSIGNMENT OF ERROR
>
> THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

## II. Law and Analysis

{¶ 13} Berry challenges only the identification element of the offenses of which he was convicted. He argues that the State failed to present sufficient evidence of this element of the crimes, and to the extent the jury found him guilty of Counts 3 and 4, he claims that the jury's resolution of this element was against the manifest weight of the evidence.

### A. Sufficiency of the Evidence

{¶ 14} In his first assignment of error, Berry argues that the State failed to present sufficient evidence of murder or felonious assault. Whether there is sufficient evidence

5.

to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 15} Berry complains that there was "only one" eyewitness to the murder. He then argues that because there was no "credible" eyewitness, the jury was forced to rely on circumstantial evidence.

{¶ 16} Evidence is "direct" where "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence." *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). "An eyewitness identification of a suspect," for example, "is direct evidence of guilt[.]" *State v. Haden*, 1996 WL 532329, *2 (6th Dist. Sept. 20, 1996). But the State is not required to prove a perpetrator's identity with eyewitness testimony. *State v. Dillion*, 2023-Ohio-777, ¶ 69 (10th Dist.). The identity of a perpetrator may be established by circumstantial evidence. *State v. Aekins*, 2023-Ohio-322, ¶ 79 (10th Dist.). "Circumstantial evidence is

6.

proof of certain facts and circumstances . . . from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Stringer,* 2013-Ohio-988, ¶ 31 (12th Dist.), citing *State v. Ortiz–Bajeca,* 2011-Ohio-3137 (12th Dist.). The Ohio Supreme Court has repeatedly recognized that circumstantial evidence has the same probative value as direct evidence. *State v. Franklin,* 62 Ohio St.3d 118, 124, (1991); *State v. Treesh,* 90 Ohio St.3d 460, 485 (2001); *State v. Martin*, 2017-Ohio-7556, ¶ 112.

{¶ 17} Here, the State presented both direct and circumstantial evidence that Berry shot C.C. Da.B. testified that she is 100 percent certain that she saw Berry shoot C.C. This was direct evidence. And T.P. testified that after hearing the shots fired, he looked out his back door and saw Berry running from the scene with a gun tucked in his waist band. This was circumstantial evidence.

{¶ 18} Berry argues that Da.B. and T.P.'s testimony should be discounted because of discrepancies or weaknesses. But we do not evaluate a witness's credibility in a challenge to the sufficiency of the evidence. *State v. Baldwin*, 2020-Ohio-699, ¶ 39 (6th Dist.). We must determine simply whether, when viewed in a light most favorable to the State, a rational finder of fact could find that the essential elements of a crime were proved beyond a reasonable doubt. *State v. Jordan*, 2023-Ohio-3800, ¶ 16, citing *State v. Dean*, 2015-Ohio-4347, ¶ 150, quoting *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.

7.

{¶ 19} Here, Da.B. testified that she was 100 percent certain that she saw Berry shoot C.C., and T.P. testified that just after hearing the gunshots, he saw Berry run from the scene with a firearm in his waistband. This evidence was sufficient to prove that Berry perpetrated C.C.'s murder.

{¶ 20} We find Berry's first assignment of error not well-taken.

### B. Manifest Weight of the Evidence

{¶ 21} Berry argues that his convictions were against the manifest weight of the evidence because discrepancies or weaknesses in the witnesses' testimony rendered them not credible.

{¶ 22} First, Berry points to inconsistencies in Da.B. and T.P.'s testimony. Specifically, Da.B. testified that she saw a group of people and heard arguing just before hearing the gunshots. T.P. testified that he saw people and heard commotion approximately 20 minutes before hearing the gunshots.

{¶ 23} Second, Berry argues that Da.B.'s testimony that she saw Berry shoot C.C. was not credible because she was at least 100 feet away, her view was obstructed, and she was distracted because she was focused on her daughter. He also complains that Da.B. could not describe Berry's clothing and he emphasizes that Da.B. saw Berry holding a cellphone—not a gun—as he stood over the victim. Finally, Berry takes issue with Da.B.'s testimony that he was at the scene on a bike as officers responded to the incident. He suggests that Da.B. must be wrong because Berry is not visible in any of the recordings from officers' body-worn cameras, which were admitted as trial exhibits.

8.

{¶ 24} Third, Berry emphasizes that T.P. *heard* but did not *see* any shots fired. He merely saw Berry running away with a weapon that was never recovered and was not proven to be the murder weapon. He also points out that T.P. testified that he knew Berry from doing repair work on his vehicle, but initially misremembered the type of car he drove. Specifically, T.P. initially stated that Berry drove a silver Pontiac G6 when, in fact, he drove a silver Toyota Camry.

{¶ 25} Finally, Berry argues that police never located the murder weapon, DNA evidence did not link him to the crime, and he was not seen in recordings from officers' body-worn cameras despite the fact that two witnesses reported seeing him at the scene while police were investigating. He claims that these facts render his convictions against the manifest weight of the evidence.

{¶ 26} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which

9.

the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 27} Here, Da.B. testified that she was 100 percent certain that she saw Berry shoot C.C., and T.P. said he saw Berry run from the scene with a gun in his waistband. Cross-examination focused on demonstrating discrepancies and weaknesses in this testimony, but ultimately, these were credibility determinations. Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Hill*, 2024-Ohio-2744, ¶ 24 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). "When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible." *Id.,* citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

{¶ 28} The jury chose to believe the State's witnesses. We cannot say that it lost its way in doing so. Berry's convictions were not against the manifest weight of the

10.

evidence simply because the jury chose to believe the State's witnesses and its version of events.

{¶ 29} Finally, it is true that the State's case was not supported by DNA evidence, the murder weapon, or images of Berry on body-worn cameras. However, none of this evidence was necessary to convict Berry. We cannot conclude that the jury "clearly lost its way" in finding Berry guilty, nor are we persuaded that the "evidence weighs heavily against conviction." We find that his convictions are not against the manifest weight of the evidence.

{¶ 30} We find Berry's second assignment of error not well-taken.

### III.  Conclusion

{¶ 31} The State presented sufficient evidence to support Berry's convictions. It presented both direct and circumstantial evidence that Berry perpetrated the offenses. Da.B. testified that she saw Berry shoot the victim, and T.P. testified that just after hearing the shots, he saw Berry run from the scene with a gun in his waistband. Discrepancies or weaknesses in their testimony are not properly evaluated on a challenge to the sufficiency of the evidence. We find his first assignment of error not well-taken.

{¶ 32} Berry's convictions were not against the manifest weight of the evidence either. Again, Da.B. testified that she was 100 percent certain that she saw Berry shoot C.C., and T.P. said he saw Berry run from the scene with a gun in his waistband. Given that the jury had the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities

11.

such as hesitancy, equivocation, and candor, we decline to interfere with its credibility determinations.  We find Berry's second assignment of error not well-taken.

{¶ 33} We affirm the August 22, 2023 judgment of the Lucas County Court of Common Pleas.  Berry is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

_____
Gene A. Zmuda, J.                                        JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.